UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                                           Plaintiff

v.                                                                           Criminal Action No. 3:21-cr-00123-RGJ

ANTONIO WILLIAMSON                                                                             Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Antonio Williamson ("Williamson") moves to suppress all evidence seized and statements made by Williamson during his arrest pursuant to the Fourth and Fourteenth Amendments to the Constitution and Rule 12(b)(3) of the Federal Rules of Criminal Procedure. [DE 53]. The Court held an evidentiary hearing on July 5, 2022. [DE 87]. The parties filed post-hearing briefs. [DE 93; DE 98; DE 101]. This matter is now ripe. For the reasons below, Williamson's Motion to Suppress [DE 53] is **DENIED**.

### I.   BACKGROUND

On May 22, 2021, police responded to a 911 call reporting a person alleged to be Williamson pointing a firearm at another person while in the drive-thru lane at White Castle. [DE 93 at 614]. The White Castle manager reported that there was a man brandishing a gun at a panhandler in the White Castle drive thru. [DE 88, July 5, 2022, Hrg. Tr. at 567]. The caller indicated that the suspect was driving a three-wheeled vehicle that was behind a Chevy Silverado. [*Id.* at 552–53]. Police officers who were dispatched to address the 911 call received this information via radio and the in-car Computer Aided Dispatch ("CAD"). [DE 98 at 636]. The incident was captured by White Castle's surveillance video, which shows Williamson driving around the White Castle in a three-wheeled vehicle. [*Id.*].

1

Officers arrived at the White Castle approximately six minutes after receiving the 911 call. [DE 88, July 5 Hrg. Tr. at 568]. Officers immediately observed the three-wheeled vehicle described by dispatch and noted that it was the only one of its kind in the drive thru. [*Id.* at 569]. The vehicle was running and there was a single person in the driver's seat who was later identified as Williamson. [*Id.* at 505–506; 510]. After approaching the vehicle, officers observed what they believed was a fake license plate that said "private" and "DOT exempt." [*Id.* at 507, 569–71]. Officers also observed a firearm inside the vehicle leaned against the center console and the passenger seat.[1] [DE 88, July 5 Hrg. Tr. at 573]. Officers asked Williamson for his identification, and he indicated that it was in his glovebox. [*Id.* at 574]. Because Williamson would have to reach past the firearm to reach his identification and because officers were concerned for their own and the public's safety, they secured the firearm. [*Id.* at 510–11, 574].

Williamson did not produce his license or any other form of identification but began recording the officers. [*Id.* at 511]. He asked the officers to identify themselves and they complied. [*Id.* at 511, 576]. Officers patiently and repeatedly explained to Williamson over the next 10–15 minutes that he needed a driver's license to operate his vehicle. [*Id.* at 511, 576–77]. Because Williamson refused to produce any form of identification, officers removed Williamson from his vehicle and detained him for driving without an operator's license. [*Id.* at 512]. After being arrested, Williamson provided the name "Naz Bey" to police and a birthday. [*Id.* at 514–15]. However, the name "Naz Bey" returned no results when officers ran it through law enforcement databases. [*Id.* at 515].

Because Williamson was being arrested, his three-wheeled vehicle—identified as a Polaris Slingshot—was going to be towed to the LMPD impound lot. [*Id.* at 554, 578]. Officers are

---

[1] The gun was identified as a CZ-USA Scorpion Evo 3, serial number E043254. [DE 98 at 637].

required to identify a vehicle's registration and VIN when a vehicle is towed to an impound lot. [*Id.* at 578]. However, officers noticed that the VIN on the exterior of Williamson's vehicle had been scratched off. [*Id.* at 579–80]. Officers were able to identify a VIN under the hood of the vehicle. [*Id.* at 581–82]. Officers ran a search on the VIN and discovered that the vehicle had been stolen out of Green Township, Ohio. [*Id.* at 583–84]. After discovering Williamson's vehicle was stolen, officers searched the interior and found additional magazines for the firearm and a bag of live rounds. [*Id.* at 584].

Williamson was initially charged under "unknown, unknown" with no operator's license, obscuring a machine over $10,000, and theft by unlawful taking over $10,000. [*Id.* at 519, 522]. After the arrest, a report from Green Township regarding the stolen vehicle provided officers with the name "Antonio Williamson." [*Id.* at 521]. Not until this point did officers identify Williamson as a convicted felon. [*Id.*].

On December 21, 2008, Williamson was convicted of third-degree burglary, two counts, in Jefferson Circuit Court, Case No. 08-CR-002736, making him a convicted felon. [DE 98 at 635]. Williamson was indicted, in this case, on one count of Felon in Possession of a Firearm in violation of U.S.C. §§ 922(g) and 924(a)(4). [DE 9 at 1]. On November 3, 2021, a superseding indictment was entered, adding two more firearms counts against Williamson. [DE 23]. Williamson moves the Court to suppress the firearm, magazine, and ammunition that were seized as a result of the May 22 stop. [DE 53; DE 93 at 613]. Williamson also moves to suppress evidence taken from the silver Apple iPhone seized on May 22 [DE 54; DE 93 at 614] and evidence seized in the search at 508 Halstead Ave, Louisville, Kentucky [DE 55; DE 93 at 615]. However, the Court has already denied Williamson's motions to suppress evidence taken from the silver Apple iPhone seized on May 22 and evidence seized in the search at 508 Halstead Ave, Louisville,

3

Kentucky. [DE 83 at 485]. Accordingly, the Court will limit its analysis to Williamson's motion to suppress the firearm, magazine, and ammunition that were seized as a result of the May 22 stop. [DE 53; 93].

## II. DISCUSSION

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). The defendant's burden extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014).

### A. The Initial Stop and Search

Williamson argues that the United States has failed to meet its burden to show that the stop, search, and seizure of Williamson was authorized by an exception to the warrant requirement. [DE 93 at 618]. In response, the United States contends that the officers had reasonable suspicion to make to initial stop and investigate. [DE 98 at 640].

An investigative stop must only be supported by reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion requires more than a "hunch," but less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "A suspicious string of separately-innocent acts can be enough to justify a stop." *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002). Whether an officer has reasonable, articulable suspicion of criminal activity "is based on the totality of the circumstances presented to the officer." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012). This is an objective standard premised on "specific facts" that "would lead a reasonable officer to suspect illicit activity." *United States v. Johnson*, 482 F. App'x 137, 143 (6th

Cir. 2012). "When an individual calls 911, identifies herself, and specifically describes a disturbance that poses a potential threat to public safety, that information is generally presumed reliable." *United States v. Fields*, 373 F. App'x 624, 627 (7th Cir. 2010). "And when a potential emergency is reported on a 911 call, police are not required to extensively verify a caller's identity before responding. *United States v. Whitaker*, 546 F.3d 902, 909 (7th Cir. 2008); *see also United States v. Farrington*, 795 F. App'x 404, 408 (6th Cir. 2019).

Here, police officers received information of a potential crime via a 911 call. [DE 88, July 5, 2022, Hrg. Tr. at 567]. The White Castle manager reported to the security company who contemporaneously relayed information to 911 dispatchers. [*Id.*]. The White Castle manager, who identified himself in the call, explained that a male outside the store was pointing a gun at a panhandler. [*Id.* at 552]. The suspect was in the drive thru in a distinctive three-wheeled vehicle. [*Id.*]. The suspect was third in line behind a Chevy Silverado. [*Id.* at 552–53]. The officers received this information via their in-car CAD system as they were in route to respond. [*Id.* at 504, 567]. Officers arrived on scene at the White Castle only six minutes after the 911 call. [*Id.* at 568]. They immediately identified the only three-wheeled vehicle in the White Castle drive-thru and a man in the driver's seat. [*Id.* at 526]. They also identified a gun in plain sight in the three-wheeled vehicle as they approached. [*Id.* at 573].

As in *Farrington*, the 911 caller identified himself and relayed specific information regarding the incident to the dispatcher. *See* 795 F. App'x 409. The dispatcher then relayed this information to the officers who arrived on the scene. *See id.* Not only is the information presumed to be reliable, see *Fields*, 373 F. App'x at 627, but officers were able to immediately verify information provided by the White Castle manager upon arriving. [DE 88, July 5, 2022, Hrg. Tr. at 526]. Under these specific facts, a reasonable officer may suspect illegal activity. *See Johnson*,

5

482 F. App'x at 143. Based on the totality of the circumstances, including the 911 call, the three-wheeled vehicle in the drive thru, and the noticeable gun in Williamson's vehicle, officers had reasonable suspicion to stop Williamson. *See Jones*, 673 F.3d at 502.

Similarly, Williamson's firearm was discovered in plain view and initially seized for the safety of officers and the public. [DE 88, July 5, 2022, Hrg. Tr. at 510–11, 574]. "[A] police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 626–29 (6th Cir. 2003). Moreover, "a motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) (quoting *Texas v. Brown*, 460 U.S. 730, 740 (1983)). In this instance, Williamson's vehicle had an open top [DE 98 at 643] and officers were able to see the gun as they approached the vehicle. [DE 88, July 5, 2022, Hrg. Tr. at 508]. Accordingly, officers rightfully seized the firearm after approaching Williamson's vehicle. *See Bishop*, 338 F.3d at 626–29.

### B. Williamson's Arrest

Williamson argues that officers did not have probable cause for his arrest. [DE 93 at 620–21]. The United States contends that the officers did have probable cause to arrest Williamson and search his vehicle under the applicable case law. [DE 98 at 644].

Probable cause exists if "the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed." *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996). Probable cause is determined by the totality of the circumstances. *See Illinois v. Gates*. 462 U.S. 213, 230 (1983). "[U]nder federal law, a police

officer can arrest an individual so long as the officer has 'probable cause to believe that a misdemeanor offense has been committed in his presence.'" *United States v. Campbell*, 486 F.3d 949, 958 (6th Cir. 2007) (quoting *United States v. Williams*, 170 F. App'x 399, 402 n. 3 (6th Cir. 2006)). In Kentucky, failing to have a license in your possession while operating a vehicle is a Class B misdemeanor. *See* KRS § 186.510; KRS § 186.990(3). Moreover, failure to maintain proper registration of a motor vehicle is considered a violation under Kentucky law. *See* KRS § 186.020(1); KRS § 186.990(1).

When officers arrived at the White Castle, they quickly noticed a three-wheeled vehicle and a man in the driver's seat, both of which were described in the 911 call. [DE 88, July 5, 2022, Hrg. Tr. at 526]. They also noticed that Williamson did not have a valid license plate or registration as required by Kentucky law. [*Id.* at 507, 569–71]. Williamson then refused to produce a driver's license after officers pleaded with him for approximately 10–15 minutes. [*Id.* at 511, 576–77]. Under the circumstances, officers had probable cause to believe a misdemeanor occurred. *Campbell*, 486 F.3d at 958. Williamson's failure to have a license in his possession while operating his vehicle is a Class B misdemeanor. *See* KRS § 186.510; KRS § 186.990(3).

Williamson's argument that he was not operating the vehicle because he was in a drive thru on private property is unpersuasive. The Kentucky Court of Appeals has held that several factors can be used in determining whether a person operated a motor vehicle: "(1) whether or not the person in the vehicle was asleep or awake; (2) whether or not the motor was running; (3) the location of the vehicle and all of the circumstances bearing on how the vehicle arrived at that location; and (4) the intent of the person behind the wheel." *Wells v. Commonwealth*, 709 S.W.2d 847, 849 (Ky. App. 1986). Here, Williamson was awake behind the steering wheel and the motor was running. [DE 88, July 5, 2022, Hrg. Tr. at 526]. Williamson's vehicle was in the drive thru,

which would indicate his intent was to drive his vehicle to the window and pick up his food. [*Id.* at 558]. The circumstances indicate that Williamson was operating his vehicle at the time officers arrived at the White Castle. *See Wells*, 709 S.W.2d at 849. Accordingly, officers had probable cause to arrest Williamson. *Campbell*, 486 F.3d at 958.

Officers also had probable cause to search Williamson's vehicle. To determine whether there was probable cause to search a vehicle, the question becomes whether the police established "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983)). Additionally, the Supreme Court has held that if a VIN is not visible from the outside of the vehicle, officers may locate the VIN by accessing the inside of the vehicle and moving items once the driver exits. *See New York City v. Class*, 475 U.S. 106, 113–14 (1986). Here, officers had arrived to investigate whether a person had pointed a gun at a panhandler and a gun was visibly sitting in Williamson's vehicle. [DE 88, July 5, 2022, Hrg. Tr. at 504, 567]. Officers also testified that they could tell the VIN had been scratched off Williamson's vehicle. [*Id.* at 579–80]. Accordingly, officers had probable cause to search Williamson's vehicle after his arrest. *See Arnold*, 442 F. App'x at 210.

### C. *Miranda* Rights

Williamson argues that he was never advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). [DE 93 at 622]. The United States contends that officers' routine questions are exempt from *Miranda*. [DE 98 at 647].

When a defendant seeks suppression of his statement based on a failure to receive *Miranda* warnings, he must establish by a preponderance of the evidence that he was subjected to a custodial interrogation. *United States v. Lawrence*, 892 F.2d 80 (Table), 1989 WL 153161, at *5 (6th Cir.

8

Dec. 18, 1989) (*per curiam*) (unpublished opinion) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) and *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984)). If, however, the defendant has faced a custodial interrogation, the United States shoulders the burden of proving, by a preponderance of the evidence, that the defendant was provided the required *Miranda* warning. *United States v. Adams*, 583 F.3d 457, 467-68 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). However, questions and statements regarding routine biographical information necessary to complete the booking process are exempt from *Miranda*'s coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). "Only if the law enforcement officer 'should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the questioning be subject to scrutiny' under *Miranda*." *Tompkins v. Warden, Dayton Corr. Inst.*, No. 1:09-CV-357, 2010 WL 4683966, at *8 (S.D. Ohio July 19, 2010) (quoting *United States v. Ochoa–Gonzalez,* 598 F.3d 1033, 1038 (8th Cir. 2010)).

Here, officers spent 10–15 minutes speaking with Williamson regarding his name and identification. [DE 88, July 5, 2022, Hrg. Tr. at 511, 576–77]. Over the course of their conversation, Williamson identified himself as "Naz Bey" and provided a birthdate. [*Id.* at 514–15]. Officers ran "Naz Bey" through their system but did not get a result. [*Id.*]. Therefore, officers were able to determine that "Naz Bey" likely was not Williamson's legally recognized name. [*Id.*]. Officers did not identify their suspect as "Antonio Williamson" until days later when they received a report from Green Township related to the stolen vehicle. [*Id.* at 521]. Such routine questions and statements related to biographical information are not subject to *Miranda*. *See Muniz*, 496 U.S. at 601. Williamson possibly gave officers a name other than his legal name to disguise the fact that he was a convicted felon. However, officers had no reason to be aware that the

information sought would be directly relevant to the substantive charge. *See Tompkins*, 2010 WL 4683966, at *8. Accordingly, the Court holds that officers did not violate *Miranda* when they stopped Williamson in the White Castle drive thru.

### III. CONCLUSION

Accordingly, for the reasons stated, and the Court being otherwise sufficiently advised, **IT IS ORDERED** that Williamson's Motion to Suppress Evidence [DE 53] is **DENIED**.

*Rebecca Grady Jennings, District Judge*
*United States District Court*

October 11, 2022